MR. ABERBACK. Thank you, Your Honor. Good afternoon. May it please the Court. THE COURT. Yes. Before you begin, just note to both counsel, we have decided that we would prefer that you direct your arguments to the first two issues, the state legislative mandate issue and the private storage investment issue. And there's no need to argue the other issues in the case. We have your briefs, and we'll address those in due course. All right. Please proceed. MR. LEISTER. Thank you, Your Honor. I'd just like to add, in light of that, that Mr. Leister, my colleague, has provided to Chief Judge Rader a list of the different cases in which the various catalog of spent nuclear fuel issues have come up, including interest as well as the overhead issue. THE COURT. Yes. We are aware of that. MR. LEISTER. Turning to the mandates, Your Honor, which is the first issue I'd like to address, this is an issue of first impression in the spent nuclear fuel cases and one of extraordinary significance. At issue is whether damages in spent nuclear fuel cases include— THE COURT. Has this come up? Is this coming up in other cases? MR. LEISTER. Your Honor, this is the first case in which it's come up. There is another case, energy nuclear Vermont Yankee, in which the government just submitted its brief last week, in which there is also a state mandate issue. But this is the first one of its kind, and this case is somewhat different than the energy nuclear Vermont case. At issue in this case is not only whether or not the government is responsible for the hard costs, the direct costs of building alternate storage facilities, which cost them the tens of millions of dollars and which the government does not contest on appeal, but also whether the government is responsible for the cost of complying with environmental policies and agendas enacted by the Minnesota legislature long after the contract was signed and in direct response to NSP's efforts to store its dry fuel storage on site. THE COURT. Mr. Roberts, I understand it, and correct me if I'm wrong. You do not challenge the costs of the mandates and the PSF facility. In other words, am I correct in understanding it's your contention that NSP did indeed spend the money it says it spent on these things, but that you should not, you being the government, should not be on the hook for it because it wasn't foreseeable? MR. RUBENSTEIN. That's correct, both for the PFS and for the mandates. THE COURT. Okay. MR. RUBENSTEIN. With regard to the mandates, this Court's ruling in Indiana, Michigan, sets forth the standard for parties seeking mitigation damages. And it's important to note at the outset that the plaintiff in Indiana, Michigan, just like the plaintiff here, was in the same position, seeking mitigation damages. And in Indiana, Michigan, this Court set forth three requirements to recover mitigation damages, causation, foreseeability, and reasonable certainty. And it's the foreseeability prong that's at issue here. And that prong requires the trial court to consider whether the loss claimed as damages was foreseeable as of the time of contracting, not just in the sense that it was conceivable, but rather that it was foreseeable as a probable result of the breach. THE COURT. Are you arguing that it was not foreseeable that some legislative permission might be required? MR. RUBENSTEIN. Yes, Your Honor. We certainly contest that for a number of reasons which we raised before the trial court. The most glaring example of that comes at page 1875 of the Joint Appendix, which is the brief that Northern States submitted to the Minnesota Public Utilities Commission when it went ahead, acting under the belief that it didn't even have to go to the legislature to get its approval. And the very first point we see in the table of contents that NSP raised before the Minnesota Public Utilities Commission was, quote, legislative approval is not required. And we see their argument in support of that at page 1889 of the Joint Appendix. THE COURT. So you're not – are there any costs in here with respect to – because I think – and correct me if I'm wrong, but I think the record showed that the NSP spent about two years before the Public Utilities Commission. I assume that the government would say that was foreseeable. MR. RUBENSTEIN. Meaning the cost of the licensing and obtaining that?  MR. RUBENSTEIN. And also the Public Utilities Commission. I mean, we know what happened. The PUC said, yes, you can go ahead, but then that was challenged, and the Minnesota court said you have to go to the legislature. Is – are there costs in here broken out just for the Public Utilities Commission effort, or is that not challenged? MR. RUBENSTEIN. That's not challenged. And the reason we're not challenging them is precisely the reason that this Court held that the tax consequences in Citizens Federal were not – were not recoverable. And the reason for that is that that's a preexisting statutory scheme that the plaintiff in Citizens Federal was aware of and that the contracting party would reasonably be chargeable with knowledge of as of the time of contracting. CHIEF JUSTICE ROBERTSON. You're saying the parties are chargeable with knowledge – were chargeable in 83 with knowledge of having to go to the PUC, but not chargeable with knowledge of having to go to the legislature, which led to the mandates and so forth? MR. RUBENSTEIN. I think that's a fair statement, Your Honor. CHIEF JUSTICE ROBERTSON. Well, suppose the legislative mandates had existed before 83, you would still be arguing that they were preempted and that those costs can't be recovered, right? MR. RUBENSTEIN. That's true, Your Honor. I don't think it's legally correct to hold that a statutory scheme that is itself unconstitutional would be foreseeable, meaning that if DOE at the time of contract— CHIEF JUSTICE ROBERTSON. So it becomes a question of causation then, doesn't it? MR. RUBENSTEIN. I don't believe so, Your Honor. CHIEF JUSTICE ROBERTSON. No? If the legislative mandates had existed before the contract was signed? MR. RUBENSTEIN. Certainly, Your Honor. If the mandates came first, then I think there would be a problem linking, from a causation perspective, the mandates to DOE's breach. And I would also, though, add that there would be a foreseeability problem, in the sense that it's not reasonably predictable or foreseeable to DOE, as at the time of contracting, that the plaintiff here would incur mandates that were unconstitutional or beyond the scope of what a state could reasonably accomplish through the legislature. I would also note that it would be unforeseeable, as it was in Hercules, for the plaintiff to go ahead and pay those mandates when there's no constitutional obligation for them to do so, that they would have had a valid constitutional defense in that case. CHIEF JUSTICE ROBERTSON. Do we have to reach the preemption question? MR. RUBENSTEIN. The Court doesn't, Your Honor. It is one of several reasons for which, as a matter of law, these mandates were not foreseeable. As I indicated before, the first hurdle the plaintiffs have to clear, and I know, incidentally, my... I would think you've got about seven or eight minutes left. MR. RUBENSTEIN. Thank you, Your Honor. CHIEF JUSTICE ROBERTSON. That's good. MR. RUBENSTEIN. Sorry, I lost my train of thought. CHIEF JUSTICE ROBERTSON. That's what I was trying to avoid. That's why I didn't interrupt. MR. RUBENSTEIN. Your Honor, can I ask you a question? CHIEF JUSTICE ROBERTSON. Do we have to reach the preemption question? MR. RUBENSTEIN. Your Honor, it is one of several reasons why we contend that the mandates were not, as a matter of law, foreseeable. One of them is the preemption question. The other is the numerous intervening events between DOE's breach and the payment of these mandates. And in that case, in that sense, it's exactly like this Court's ruling in Old Stone. There were numerous intervening causes. There was the change in law. Northern states itself believed that legislative approval was not required as of the time it actually applied. Certainly, DOE had no reason, as of 1983, when the standard contract was executed, to believe that a likely consequence of its breach would be that northern states would have to get legislative approval, when northern states itself didn't think so. There was also what northern states' chief executive described during trial and cross-examination as the hijacking of the state legislature by special interests who were opposed to nuclear power. That's another third party stepping in, just like in Old Stone, just like the case that Old Stone cites, including the Louis George case, where it's talking about how it's not foreseeable when third parties step in and cause damages. Did northern states have any other choice than to confront the legislative question and to adhere to the mandates? Well, Your Honor, I'm not here to suggest that they behaved unreasonably. We're not arguing that they didn't act reasonably. But 17 years after the fact, they never sought a preliminary injunction. They contended that it would have been unreasonable for them to do so. Even after they obtained permission, they could have said, before we write any more checks, we don't think that we should have to pay these because the imposition of these mandates is unconstitutional. So the question is not reasonableness of their actions, but the question of whether this entire course was foreseeable in the first place. That's right. And the critical inquiry here is what's set forth at section 351 of the restatement. And when it's talking about losses that are caused by a confluence of different circumstances. And northern states here suggest that the only circumstance here that's relevant is DOE's breach. But I would submit, Your Honor, that there are several other circumstances that I've talked about here. The hijacking of the legislature. The change in law. The 2003 amendments to the Minnesota mandates that not only required NSP to pay $8.5 million a year, but then an increase in price up to $16 million a year. There's no logical stopping point to the consequences of the breach, if northern states argue that we're correct. What are we to make, though, of the unique environment in which this case arises? Namely, the whole question of what do you do with spent nuclear fuel? And I think one can almost take judicial notice of the fact that that's a volatile issue. I mean, this arose in the wake of Three Mile Island and so forth. I mean, doesn't that color the foreseeability question and reasonableness a bit? It's certainly a background factor. It's a different situation kind of than what you had in Hercules. Yes, Your Honor. But I think it's important to recognize here that Congress has specifically designated the Nuclear Regulatory Commission as the arbiter of what is safe with respect to nuclear power and what is not. And northern states had the opportunity to contest – I'm sorry, the state of Minnesota had the opportunity to contest northern states' powers application for a license to have a dry storage facility. It did not. And the NRC has made the judgment, as Congress envisioned, that it is safe to store nuclear waste on site, even in the face of the fact that DOE has not commenced spent fuel acceptance. The NRC has still, in the face of that, said it's okay to store nuclear waste on site. DOE has promised that it's coming. We're not going to permit states to legislate a hodgepodge of restrictions on that. And we have faith that DOE will be coming. Plaintiffs themselves acknowledge that by suing for partial breach rather than for total breach. And in the face of that, it's solely within the ambit of the NRC to make that judgment. But what about – this relates to your point there should have been a challenge to the – but what about the fact that you have, in a sense, kind of a ticking clock here with respect to spent fuel piling up and having to find a place for it and so forth? Again, there are reasonable arguments to be made on both sides as to whether or not the spent fuel needs to be taken immediately. But the NRC has concluded and has effectuated Congress's will that it is okay and it is safe to store nuclear waste pending DOE's acceptance of that fuel. Well, they can't do something that's designed to take account of safety anyway. It's designed to address the safety issue because that's clearly preempted, right? To the extent that the state of Minnesota – If it's motivated by safety, it's preempted. That's absolutely right, and we know that it is preempted. So it may be foreseeable that they would be concerned about safety, but to the extent that they're concerned about safety, that's exactly what is preempted. That's exactly right, Your Honor, and if I can take it a step further, there are undeniably components of this legislative scheme that are right in the wheelhouse of the NRC. The legislative mandates incorporate the Public Utilities Commission's order. That order dictates the amount of radiation that can be emitted from the dry casks. Right within the scope of the NRC's authority. It dictates what kind of fuel is properly loaded to the spent fuel facility. Again, right within the NRC's wheelhouse. The NRC, it's important to recognize, granted NSP the unqualified right to load 48 casks to its dry storage facility. And the state of Minnesota said, well, not so fast. We're only going to let you, or we're only going to purport to let you, load 17 of them. And when you do, we're going to require you to pay what now amounts to hundreds of millions of dollars. Mr. Haberbeck, I'm going to restore your rebuttal time, but please take the minute and a half you have on the clock to address the other issue, the private storage investment question. Certainly, Your Honor. NSP's decision in this case reflects a voluntary decision to invest in a for-profit company as a means of I would say that this was also done because of the concerns about not being able to get state approval for it. That's correct, Your Honor. That's certainly what they said. But there were numerous ways that they could have attempted to participate in private fuel storage without being the single largest investor in the company. They invested, NSP invested more than 25 or nearly 25 If legislative mandates are not foreseeable, then doesn't that necessarily mean that the investment in PFS is not foreseeable because the justification for it is the concern about the legislative mandates? I think that's exactly right, Your Honor. The only justification that the trial court set forth for their participation in PFS, their continued participation in the face of PFS, was that they were forced to do so. But if that's not a legitimate justification, and if that's beyond the scope of the state's authority, then it necessarily follows that trying to mitigate in a second way, as they're doing here, not only with their construction of their dry storage facility, but with a second means of mitigation, would be unforeseeable to the Department of Energy as of the time of contracting. Briefly, the other point we raise with respect to PFS is that the plaintiffs have failed to address the extent of their damages. As in the Sol case, and I see my time is up, that we cite, the plaintiff has a burden not only to establish what it spent, but also the value of what it obtained in return. And the plaintiffs didn't meet the burden in that regard. I'd like to reserve my remand. Thank you. We'll restore five minutes for rebuttal, and we'll add an extra five minutes to Mr. Tomashev. Yes, Your Honor. All right. Was I close in the pronunciation? You were perfect, Your Honor. Thank you. Excellent. Very good. Please proceed. May it please the Court. This is a classic mitigation case, which was originally filed in 1998. So why is it that these legislative mandates aren't preempted? Some of them look like simple blackmail. How is it that the state can impose those costs on the federal government? Well, first of all, the government did not raise that issue below. But with respect to the merits of the issue, the Supreme Court held in the Pacific Gas and Electric case that a California statute, the Warren-Alquist Act, which is substantially similar to the piece of legislation that is at issue here, was not preempted. So, too, in this case, the state is entitled to regulate certain issues. You're absolutely correct. I'm having trouble seeing why the Pacific Gas legislation is identical to this one. I mean, that was a question of whether you could build a plant in the first place, and the state's concern was as to whether it would be economical to do it. What does a biomass mandate have to do with that situation? Because it deals with the need, cost, and reliability of electricity, and that is exactly what the Supreme Court said was not preempted in the California statute. The California statute is worse than the Minnesota statute. In California, you cannot build a new nuclear plant because of the state legislation, which ties the construction of a new plant in California to a determination that the government, the U.S. government, has a satisfactory solution to spent nuclear fuel. This is a much more limited form of regulation by the state of Minnesota. Even if it's not preempted, why was this foreseeable? In what respect could this have been foreseeable? It was foreseeable in several respects. First of all, that was an issue of fact before Judge Weiss. We absolutely agree with counsel for the government that the Indiana-Michigan standard applies. It's causation, foreseeability, and reasonable certainty. There's no issue with respect to reasonable certainty of the cost, as government conceded in response to Judge Shaw's question, and there's no issue with respect to causation. So the only issue is foreseeability, which is clearly a fact determination. Now, for several different reasons, Judge Weiss got that part of his decision absolutely correct. Number one, the Nuclear Waste Policy Act, which predated the contracts in question, actually has a provision in it which talks about the need for dry fuel storage, and indeed it gives the— But the question is how were these legislated mandates foreseeable? I mean— They were foreseeable because the Nuclear Waste Policy Act on which the contract is based foresaw that states could veto dry fuel storage legislation, so it was at least foreseeable to the Congress when it enacted the statute. And a significant fact, which counsel for the government consistently ignores, is that the first acting head of the waste program, Robert Morgan, admitted at trial that he was concerned in 1983—he was the first head of the program— that various states, including Minnesota, might enact laws limiting spent fuel storage. Well, that may all well be true, but isn't there a difference between that kind of action and the imposition of mandates that are really unrelated to the storage of spent nuclear fuel? With all due respect, Your Honor, these mandates are directly tied to the storage of spent nuclear fuel on the plant, and the reason— How is that? How is the biomass and the alternative fuels thing, how is that tied into the storage issue? It looks as though it's—not to put too fine a point on it—it looks like blackmail. I'm sorry? It looks like blackmail. Well, I don't know that it was blackmail, Your Honor. I think the legislature viewed that it had the authority to impose economic restrictions, if you will, on the operation of the dry fuel storage facility, and Northern States Power, they're the non-breaching party. They had no choice. They were looking at possible shutdown of the plant, which would have been a billion dollars in damages, versus trying to get the plant operated. That's a different issue. The question is, why would anyone foresee that the states would step in and impose these kinds of mandates at the time the contract was signed in June of 1983? And my answer to that, Your Honor, is the underlying statute envisioned that the states could veto dry fuel storage. So that—it was not only foreseeable— Does that mean that the state could impose any mandate it wanted, without limit? I think they could impose mandates that were related to, essentially, the need, cost, and reliability of electricity. That's what the Supreme Court said in the PG&E case, which was coincidentally decided before these various contracts were executed. And I would respectfully submit that when the first director of the program admits at trial that, indeed, he was concerned that Minnesota and other states might restrict the ability of the federal government to operate either an MRS or dry fuel storage. Suppose the state had imposed a mandate saying, you can only build this SNF facility if you contribute $100 million to secondary schools in the state. I think, Your Honor, the answer is that the mandates— that state action in the form of mandates was not only foreseeable, it was foreseen— That also—that cost also would be recovered. Well, I submit that the law in this circuit is that if the mandates are foreseeable, the particular details— That mandate is so, in your view, would be foreseeable also. I would submit that to the extent that state intervention was not only foreseeable but foreseen, that the particular details— I'm going to answer my hypothetical. In the hypothetical, you can build the SNF facility, but you've got to contribute $100 million to secondary education in the state. Is that a foreseeable mandate? I would submit, Your Honor, that the answer to that question is that this Court has held in two cases, Citizens Federal— If the answer is yes, is that a foreseeable? I think if the underlying action taken by the state is foreseeable, then the individual components that— But what's the answer to the question? In that hypothetical, would that be foreseeable? I think that it could be. Yes, I think— But, Your Honor, isn't your—I mean, I have to say respectfully, isn't your stronger case to concede that point and say that there is a limit on what's a reasonable, foreseeable thing, so to speak? I mean, I think the government, in its brief, had the example of the— if they had to—required to put up an office tower in downtown Minneapolis or St. Paul, there has to be a limit on what's foreseeable. And I think, quite properly, I mean, I think the hypothetical that Judge Dyke posited to you sort of has crossed the line. Isn't it better for you to concede that there may be some outliers in terms of what a state would impose that would not be foreseeable because they would, to the normal, objective mind, be so unreasonable and unrelated to the issue at hand? Well, with respect— His hypothetical really highlights well a question that I have in my mind. Where does foreseeability come up and bump up against reasonableness and cross the line? Well, let me just say in response to that, Your Honor, in this particular case, Judge Weiss heard 21 days of testimony, including from the CEO and president of the company on down. And he— Well, no, I'm not arguing—again, I'm picking up on Judge Dyke's hypothetical, which I realize isn't the case here, but I think it illustrates the point. Isn't there a line somewhere that is crossed where one has to say because it's so, if you will, outlandish, that it's not foreseeable? Well, it may be that there is such a line, but this Court has an articulated one. And the two cases that I think directly address this circumstance that Judge Dyke raised is the Citizens' Federal case and the Anchor Savings Bank case. And in both of those cases, this Court held that the exact nature of the particular— Is there any difference between my hypothetical and what happened here? And if so, what is it? I think there is a significant difference, Your Honor, because the legislature here, and indeed it's reflected in the actual statute, is concerned about economic issues. If you look in the joint appendix where the actual statute appears, there is a section on economic regulation. That's in the 1994 statute. That's the first statute that was enacted in which the mandates were placed into force and effect. Where is that provision in particular? In the JA. I mean, I know that we have the statutory language. It's in the joint appendix, Your Honor, at 3033. 3033? Yes, Your Honor. Article 2, Economic Regulation of Nuclear Power Plants. And that's from the 1994 statute. And that, indeed, is what the legislature did. I thought the mandates were not under that heading. The mandates are scattered throughout Section 641. Yes, so they're not under the economic regulation heading. Right? They do not appear under Article 2. But Article 2 is part and parcel of the amendments to Section 641. How is it economic regulation to say that you have to pay us some money to use for biomass or alternative fuels? Why is that economic regulation? Because it requires the payment of money by NSP to continue to operate this power plant. Well, that sounds as though any payment of money is economic regulation. Well, this particular payment of money deals with the type of energy Northern States acquires and then sells to its customer. It's as economic as any activity they engage in, with all due respect. It's certainly not a safety issue. None of the damages for which we're seeking recovery here involve in any way, shape, or form the NRC's admitted province to regulate safety. Well, doesn't it have an effect on safety? That if the state is saying you have to pay hundreds of millions of dollars to store the fuel, then it's a disincentive to fuel storage, which is something which raises a safety concern. I don't think, with all due respect, Your Honor, I don't think it's a safety issue at all. This deals with the sources from which Northern States can acquire energy. We had to acquire biomass as a result of the mandates. That's an economic issue. The legislature expresses a concern, as did the State of California in the Warren-Alquist Act, with respect to, and I'm reading now from the joint appendix at 3033, this legislature, the legislature finds that there is great uncertainty over the means and costs of disposing of radioactive waste generated at nuclear-powered electric generating plants. I would note that the word costs, Your Honor, appears, I think I counted this morning, five different times in that section. So the state is concerned about the costs and whether the ratepayers are going to be forced to deal with the costs of additional on-site storage. As a result, NSP does the best it can do. And the suggestion that we somehow didn't fight about this is also not correct. We indeed, after the Minnesota Court of Appeals concluded that we had to go back to the legislature, Northern States Powers sought review by the Minnesota Supreme Court. But you didn't go to court, Your Honor. I'm sorry? You did not go to court to challenge it. We went, we sought certiorari before the Minnesota Supreme Court. No, no, on preemption grounds. You didn't go to the federal court challenging these mandates on preemption grounds. We didn't, Your Honor, because we had exhausted our appeals at the state. But the state appeals didn't involve preemption, did they? Your Honor, with all due respect, in light of the Supreme Court's decision. Did they involve preemption? I'm sorry, Your Honor. Did the state appeals involve the preemption question? The state appeals did not, to the best of my recollection, involve preemption issues. But we did take action, at least within the state of Minnesota. And then Northern States has a very short window of time, because if we had filed, assume that we had gone to federal court, I think we would have been looking at a shutdown. We had a very short window of time to deal with this issue. Well, there's things called preliminary injunctions, right? Your Honor, the company made the decision at the time that preemption was not a legitimate option for them beyond pursuing what they did in the Minnesota Supreme Court. And they did the best they could with respect to the legislature. And Mr. James Howard, the chairman and CEO, testified at length before Judge Weiss with respect to his very serious concern that the plant was going to be shut down. Is there any discussion in the testimony about the availability of preliminary injunctive relief? You know what, Your Honor? The government never raised this issue at the trial. No, no. Just answer my question. Was there any discussion at the trial about the availability of preliminary injunctive relief? There was no discussion about that, as best I can recall, at the trial. But I would again note that the government didn't raise preemption before the trial court. Mr. Howard was there. He was cross-examined extensively. There's nothing in the record with respect to the government ever asking the chairman and CEO about that issue. Nor is there any discussion of it in Judge Weiss's decision, nor in the briefs before the court. That's why we argued here that preemption was not properly raised and should not be considered by this court. There's no discussion of it at all in either of Judge Weiss's decisions. What about the PFS expenditure? That also was the result of concerns about the inability to secure legislative approval. I think the issue about PFS, Your Honor, was tied to the same concern that led the then chairman and CEO to do the best he could with the legislature, and that was whether or not the plant was going to have to shut down. But that's also related to concern about legislative mandates. Well, they were concerned in part about the ongoing legislative mandates. The first set of mandates were enacted in 1994, and a second amendment, if you will, to the mandates was enacted in 2003. So we have the same concern here about the foreseeability of legislative mandates with respect to PFS, right? Your Honor, there was a concern in part about the ongoing impact of legislative mandates. There was a significant concern that the plant might still have to be shut down, and there was also an ongoing concern that the government was not going to perform, and NSP, which was paying literally millions of dollars to the government, needed to come up with some alternative solution. This is not a sort of fly-by-the-seat-of-its-pants operation. Northern States is a very conservative utility. It does not go about spending money willy-nilly. It doesn't have that flexibility. This was what NSP viewed as a legitimate surrogate performance, given that the government was not coming. We were trying to get another facility available, faced with the government's complete failure to perform. I understand that the NSP facility is no longer in the works. Nothing was ever built, correct? PFS facility. It does have a license, Your Honor, which was awarded in 2006, but it has not yet been built. Okay. So the money that we're talking about that's in the $24,720,000 is for the licensing approval process, correct? Yes. Okay. And I would note that with respect to PFS, this is also a foreseeability issue, on which the government must show that Judge Wiese's decision was clearly erroneous. It was not. Here again, his findings on PFS were supported by extensive testimony. Mr. Howard, whom you've heard me refer to, Mr. Bomberger, who's quoted at length. It was really the essence of mitigation. They were attempting to find an off-site solution to the government's failed performance. And given that, it seems to us that it was eminently foreseeable. And indeed, we would note, and Judge Wiese cites this in his first decision, the Department of Energy itself, in 2001, issued a report to Congress that PFS was a viable alternative for NSP. Let's assume hypothetically that we were to decide that the legislative mandates were not foreseeable. Wouldn't that also mean necessarily that the PFS expenditure was not foreseeable because it arose out of the same concerns about legislative mandates? Well, I would respectfully submit that no, Your Honor. There were a host of concerns that caused NSP to pursue PFS. But the one that the Court of Federal Claims relied on was the concern about the legislative mandates, right? Well, I don't know that that is quite fair to Judge Wiese. I think Judge Wiese determined that we were looking for an alternative form of performance to the government's failure of performance. Because of the concern about legislative mandates, right? Well, if I'm wrong about that, show me, because I'd like to see. Well, I will look at Judge Wiese's decision, but I think Judge Wiese's decision was based upon several findings, including but not limited to this was an alternative to northern states for the government's failed performance. Well, I think we're pretty much done with the questions. If you could just take the minute to take a glance, if you could find that spot right now while you're there, that would be appreciated. Do you have a copy of the opinion before you? I do, Your Honor. If you can't put your finger on it, that's fine. We'll find it. It would be helpful if you could do it right now. It's discussed separately, I would note, in the original decision. Judge Wiese, starting at Joint Appendix 16, discusses the mandates. And then starting at Joint Appendix 18, he discusses separately private off-site spent fuel storage facility, which is PFS. Right. And he ties it there, as I read it, into concern about these legislative mandates. With all due respect, Your Honor, at Joint Appendix 18, plaintiffs saw in the lower right-hand corner, plaintiffs saw the private fuel storage initiative as its only means of addressing its very real concern that DOE's continuing non-performance would eventually force upon it the need for spent fuel storage capacity that a divided legislature either would be unable or unwilling to satisfy. So he refers both to the legislation as well as DOE's non-performance. And we would submit, Your Honor, that DOE's non-performance was driving private fuel storage. As an alternative, it's exactly what the government was supposed to provide under the contract. All right. Thank you very much. Mr. Auerbach? Mr. Auerbach, let me ask you one question because time is limited here. At Joint Appendix 16 through basically Joint Appendix 20, we have Judge Wiese's discussion of the forcibility issue, one, as it relates to the mandates, and two, as it relates to the PSF facility. And he makes various factual findings in that part of the opinion. Do you challenge those findings or do you—because I don't see anywhere where— I mean, do you challenge those factual findings as clearly erroneous or are you saying that he was saying the wrong thing, he was addressing the wrong issue? I want to make clear. The latter, Your Honor. In other words, you don't challenge that Mr. So-and-so testified as to— there's that testimony at the top of, I guess it's 18 or 19 maybe. Mr. Bomberger? Yeah. We certainly don't challenge what he said, what's attributed to him. However, the fundamental problem with the trial court's analysis was the failure to engage in the foreseeability analysis that's required by Indiana-Michigan. The trial court found that the foreseeability prong was satisfied merely by showing that the plaintiff acted in good faith and commercially reasonably and then didn't see fit to inquire whether or not the circumstances that caused the loss were foreseen. It expressly disavowed the need to inquire whether the circumstances that caused the loss were foreseeable. What kind of testimony do you think northern states should have come forward with on the foreseeability issue? I think the only way I can answer that question is to establish that— or to say that the testimony that they provided with regard to their direct dry storage costs was sufficient to establish that those costs were foreseeable. They came in and said, well, if DOE didn't perform, they knew that we would have had to do something. I understand the government very fairly doesn't challenge that. But in terms of mandates and the PSF facility, would it be satisfactory if, say, a plaintiff in NSP's position came in with someone who was an expert or a lawyer who knew the legislature out there and said in 1983 one would have anticipated these kinds of problems arising in the Minnesota legislature? I mean, I'm just—is that the kind of thing that you think would be necessary or that you would come forward with if you were representing NSP? I think that they tried to do that, Your Honor. And if I can go to page 489 of the Joint Appendix, this was during cross-examination of Senator Stephen Novak, who was the chairman of the Senate Energy Committee in the state of Minnesota. And Mr. Novak was asked specifically, when you were chair of the Energy Committee in the early 1990s, as you mentioned, it never occurred to you, did it, that the legislature would eventually become involved in decision-making with regard to whether Prairie Island could expand its storage capabilities. Isn't that correct? Answer, that's probably correct. In fact, the gentleman in the world who was most knowledgeable about what was likely to come before the Minnesota legislature concerning spent fuel storage said it never even crossed his mind that this was the kind of thing that they would eventually wade into. And yet, Northern states would like to ascribe knowledge of that circumstance to the Department of Energy in 1983. It's simply not—it's not plausible to suggest that DOE should have been constructively aware or was aware of the fact that this would come before the state or come before the state legislature. A couple points that I just wanted to get to quickly. First, counsel repeatedly referenced the portion of the statute that addressed economic considerations and tried to compare that to what happened in the Pacific gas case before the Supreme Court. Judge Dyke, you were correct in your analysis, and this is set forth on page 26 of our reply brief. That section is distinct from and not a part of the legislative mandates. That section, the economic considerations that the state of Minnesota took into account when it enacted legislation in 1994 contained two requirements, one of which had to do with the efficiency of nuclear power plants and the other had to do with no additional construction, just like in Pacific gas. None of those requirements had anything to do with biomass, with wind, with a settlement with an Indian tribe. A completely distinct issue. Counsel indicated that—well, the counsel cited to the testimony of Robert Morgan and the text of the Nuclear Waste Policy Act itself, the concerns that Mr. Morgan raised were related to citing of a Yucca Mountain-type facility. Clearly, no state wanted the importation of other states' nuclear waste, and that certainly was foreseeable, but it's an entirely different subject altogether to suggest that Mr. Morgan's testimony that he was concerned that it might be hard to find a Yucca Mountain-type facility is the same as saying that a utility that already has a nuclear power plant on site won't be able to move its fuel within the protected area of its confines. All right. Mr. Haberbeck, I thank you very much. Your time has expired. I appreciate both counsel. Thank you, Your Honor. The case is submitted.